Breitel, J.
In an action for damages and to enjoin a discharged employee from soliciting his former employers’ customers, defendants appeal. The issue is whether the employers’ investment of time and money in accumulating a list of approximately 15,000 customers, most being readily ascertainable in the trade as likely users of plaintiffs’ services, entitles the list to trade secret protection.
After a nonjury trial, the court concluded that the list of customers and catalogue of customer data were trade secrets, and enjoined defendants from doing business with any of plaintiffs ’ customers. The Appellate Division affirmed with two Justices dissenting.
The judgment should be reversed and the complaint dismissed. Plaintiffs have failed to. prove a ¡physical appropriation or copying of confidential information, or wrongful disclosure or use of a trade secret. In particular, no trade secret protection is warranted since plaintiffs’ customers are likely, if not known, users of the employers’ merchandisejand engaged in business at advertised locations.
Plaintiff corporations are engaged in selling building maintenance supplies to industrial and commercial users. Plaintiffs purchase their inventory from independent supply houses and then, at a substantial markup, resell to customers under their own label. Plaintiff Silfen sells soaps, polishes, waxes, finishers, and disinfectants, while plaintiff Formula 33 Corporation specializes in ice and snow melting compounds.
In 1949 defendant Cream joined Silfen, then engaged only in the paper and twine business. Cream was assigned and became solely responsible for the development of a cleaning and maintenance chemical supply division. During its formative years Cream interviewed and hired salesmen, developed products, and found suppliers. Initial customer solicitation consisted of direct contact and media advertising. Meeting little success he employed the services of mailing houses which provided lists *390 of prospects to whom brochures and business reply cards were forwarded. Eventually, an average of one million mailings were made.annually with a reply rate of 0.6%. Of those replying 25% became customers at an average cost per new customer in 1967 of $45. Over the years, some 15,000 customers were obtained.
For each customer a separate file was kept containing: name of purchasing agent and other personnel at customer’s office; temperament of purchasing agent; gratuities given; particular requirements; and past purchases. In 1961 these customer profiles were consolidated into a central filing system and measures were taken to insure that each salesman had access only to that portion of the files containing his customers. So concerned were plaintiffs in the protection of this information that in the employment agreement with each salesman hired after 1961 it was provided: ¿“JThe salesman] acknowledges that the list of the Corporations’ customers is a unique asset of their respective businesses, and * * * will not, during or after the term of his employment, appropriate to his own use or disclose to others for any purpose, any names on such list or any cgnfidential information obtained by him during his employment/’ Vigilance is also demonstrated by a form required to be signed by each salesman after contact with a customer: “ The names of all the company customers ever called by me, and those appearing on the face of this telephone report sheet, were obtained from leads furnished by the company and remain the property of the company and will not be disclosed to any unauthorized persons in violation of the trust placed in me by the company.”
In 1965, on the death of the principal of Silfen and the taking of control by his widow, Cream was named executive vice-president and general manager of plaintiff corporations for a term of 12 years. The written agreement between the parties provided for a base salary of $26,000 plus 25% of the aggregate net profits. The corporations reserved the right to discharge Cream if the aggregate net profits in any one year failed to exceed $35,000. It was also provided thatAJ Cream terminated the agreement he would “ not, for one year there after * * * engage in the sale to the corporations ’ customers of any products *391 competing with the corporations’ products.Since Cream was discharged this restriction is not controlling. The agreement contained no comparable provision to cover Cream’s discharge.
On November 17, 1967, Cream was discharged purportedly because of a decline in net profits. Cream, however, urges that he was discharged in order to make room for the new husband of the widow, the former Mrs. Silfen. Thirteen days after his discharge he set up Eeal Estate Maintenance Chemical Specialty Corporation and engaged in the same business as plaintiffs except limited to building owners and building managers. About three months later, in March, 1968, plaintiffs brought this action to enjoin defendants’ solicitation of plaintiffs’ customers. The complaint alleged that defendants had been soliciting plaintiffs’ customers, that Cream had made copies of plaintiffs’ secret and confidential customer files, and was using such information in his solicitation. Cream admits that of a list of 1,100 customers submitted by plaintiffs defendants had solicited 47. Defendants, however, contend that the names of these customers were procured from available commercial lists complied by commercial list houses. Defendants allege in ther answer and assert in their testimony that the customers are openly engaged in business at advertised locations and their Jnames are well known to plaintiffs’ competitors.
Notably, plaintiffs did not attempt to sustain their allegation that Cream had made copies of plaintiffs’ secret and confidential files, or used the recorded detail in those files with respect to each customer’s “ profile ”. The solicitation of plaintiffs’ customers was at most the product of casual memory, or, as defendants would have the court believe, coincidence.* If there has been *392 a physical taking or studied copying, the court may in a proper case enjoin solicitation, not necessarily as a violation of a trade secret, but as an egregious breach of trust and confidence while in plaintiffs’ service (Scott & Co., v. Scott, 186 App. Div. 518, 524-525; Ann., Customer List—As Trade Secret—Factors, 28 ALR 3d 7, pp. 120-124; 36 N. Y. Jur., Master and Servant, § 75; cf. Duane Jones Co. v. Burke, 306 N. Y. 172, 187-188; Bruno Co. v. Friedberg, 21 A D 2d 336, 339-340; former Penal Law, § 553, subd. 6). [Nor is there any allegation or evidence of other wrongful or fraudulent tactics employed by Cream in connection with the solicitation of plaintiffs’ customers) If there had been, a court might award damages and enjoin further similar conduct as constituting unfair competition. (Scott & Co. v. Scott, supra, at p. 525; Ann., 28 ALR 3d, supra, at pp. 128-129; 60 N. Y. Jur., Trademarks, Tradenames, and Unfair Competition, § 127.) All that remains, therefore, on the theory alleged in the complaint or developed on the trial is whether plaintiffs’ customer list, exclusive of the recorded • detail about each customer, classifies as a trade secret rendering defendants ’ solicitation of customers on that list improper, sufficient to warrant injunction and damages.
Generally where the customers are readily ascertainable outside the employer’s business as prospective users or consumers of the employer’s services or products, trade secret protection will not attach and courts will not enjoin the employee from soliciting his employer’s customers (Boosing v. Dorman, 148 App. Div. 824, 827, affd. 210 N. Y. 529; Tepfer & Sons v. Zschaler, 25 A D 2d 786, 787; Hudson Val. Propane Corp. v. Byrne, 24 A D 2d 908, 909; Abdallah v. Crandall, 273 App. Div. 131, 133-134; Goldberg v. Goldberg, 205 App. Div. 435, 438-439; Scott & Co. v. Scott, supra, at pp. 524-525, 527; McLean v. Hubbard, 24 Misc 2d 92, 96-97, affd. 11 A D 2d 1084 ; 60 N. Y. Jur., Trademark, Tradenames and Unfair Competition, § 113; 2 Callmann, Unfair Competition, Trademarks and Monopolies [3d ed.], § 54.2 [c] [2], pp. 434-449, esp. 443; Ann., Customer List—As Trade Secret —Factors, 28 ALR 3d 7, § 10, subd. [b], supra; as to trade secrets generally see Bestatement, Torts, § 757). [Conversely, where the customers are not known in the trade or are discoverable only by extraordinary efforts courts have not hesitated to *393 protect customer lists and files as trade secrets. This is especially so where the customers ’ patronage had been secured by years of effort and advertising effected by the expenditure of substantial time and money (Town & Country House & Home Serv. v. Newbery, 3 N Y 2d 554, 558-559; Cupid Diaper Serv. v. Adelman, 27 Misc 2d 1095, 1096; 2 Callmann, op. cit., supra, p. 447 and cases cited; 36 N. Y. Jur., Master and Servant, § 76, p. 505, cf. Hudson Val. Propane Corp. v. Byrne, supra, at p. 909; Witkop & Holmes Co. v. Boyce, 61 Misc. 126, 131, affd. 131 App. Div. 922).
The customers solicited by defendants, as apparently found by the trial court, are openly engaged in business in advertised locations and their names and addresses may readily be found by those engaged in the trade. Indeed, plaintiffs’ counsel apparently conceded as much at the conclusion of the trial, but thought that circumstance irrelevant unless defendants had actually obtained the prospects from commercially available lists and not from Cream’s prior service with plaintiffs. Relying upon this court’s opinion in Town & Country House & Home Serv. v. Newbery (3 N Y 2d 554, supra), the trial court apparently believed that commercial notoriety of defendant’s prospects as users of this type of service is not controlling, misapplying, it is suggested, the Town & Country case to make an exception where there has been substantial effort by plaintiffs in acquiring their patronage.
Indeed, the Town & Country case presents an interesting contrast. Plaintiff in that case was engaged in the business of house and home cleaning by contract with individual householders. After three years of operation it had acquired 240 customers. Defendants left its employment, established a competing corporation, and solicited 38 of plaintiff’s customers. Only plaintiff’s customers were solicited. The court marked the type of customer that the parties serviced.
“ [T]he customers of plaintiff were not and could not be obtained merely by looking up their names in the telephone or city directory or by going to any advertised locations, but had to be screened from among many other housewives who did not wish services such as respondent and appellants were equipped to render, but preferred to do their own housework. In most instances housewives do their own house cleaning. *394 The only appeal which plaintiff could have was to those whose cleaning had been done by servants regularly or occasionally employed, except in the still rarer instances where the housewife was on the verge of abandoning doing her own work by hiring some outside agency.” (3 N Y 2d, at p. 559).
“ It would be different if these customers had been equally available to appellants and respondent, but, as has been related, these customers had been screened by respondent at considerable effort and expense, without which their receptivity and willingness to do business with this kind of a service organization could not be known.” (id., at p. 560).
Unlike the customers in the Town & Country case (supra), /plaintiffs ’ customers were readily ascertainable as likely prospects^] Although plaintiffs have demonstrated an investment of time and money in developing a patronage of approximately 15,000 enterprises, the/investment was not an attempt to create a market for a new type of service as was the ease in the Town & Country case?] Bather, that investment reflected simply widespread canvassing of an obvious and highly competitive market. Indeed, consider the comparable investment in the distribution of soap and soap products to the individual consumer. A better parallel than the Town & Country case is Abdallah v. Crandall (273 App. Div. 131, supra). In Abdallah the plaintiff employer was engaged in the dairy business and the defendant employee made deliveries on some of plaintiff’s retail milk routes. When the defendant left plaintiff’s employment, he joined a competing business and solicited his former customers. In dismissing the former employer’s action to enjoin such solicitation, the court noted: “ In some instances a list of customers may be a trade secret but it would be straining the meaning of the word beyond any reasonable limit to hold that the list transferred in this case came within that category. The plaintiff himself conceded on the trial of the action that every householder in both of the communities involved either bought milk or was a potential customer for it. It was also conceded, and it is a matter of common knowledge, that the delivery of milk from the very nature of the business is open and notorious. A trade secret, like any other secret, is nothing more than private matter; some-think known to only one or a few and kept from the general public, *395 and not susceptible to general knowledge (Kaumagraph Co. v. Stampagraph Co., 235 N. Y. 1). A list of milk customers in a small city like Cortland, and a village like Homer, hardly meets such a definition. We are, therefore, constrained to hold with the referee that the list of Brown’s milk customers was not a trade secret according to the accepted meaning of that term.” (pp. 133-134).
In the absence of express agreement to that effect between the parties, or a demonstration that a customer list has the several attributes of a trade secret, courts, without more, should not enjoin an ex-employee from engaging in fair and open competition with his former employer. The limiting effects upon the former employee with respect to his ability to earn a living are marked and obvious. (Cf. Purchasing Assoc. v. Weitz, 13 NY 2d 267, 272; Paramount Pad Co. v. Baumrind, 4 N Y 2d 393.) Moreover, the issuance of the permanent injunction in the present case has an untoward consequence. By discharging Cream plaintiffs obtained greater protection than they would have had under their agreement with him, if he had terminated the employment. It was observed earlier that the 1965 employment agreement provided that Cream would not solicit plaintiffs ’ customers for one year following his termination of the employment. This provision suggests that the parties considered Cream’s role as a future competitor, and, more important, were satisfied to provide protection for only one year.
In concluding, it may be stated expressly what was earlier implied, namely, that [if defendants had been shown to have appropriated by copying, studied memory, or by some other manner which does not now come to mind, the detailed information in the customer files there would be a case quite different from thisTj The record shows no such appropriation with respect to a single customer, let alone many customers to an extent barring reliance on casual memory. Instead, it shows that defendants solicited 47 of the 1,100 customers submitted on a list prepared by plaintiffs from its confidential files. The point is that in the circumstances described names of customers alone involved no trade secret and there was no wrongful conduct by defendants. If trade secrets there were, they consisted of the data in the carefully secured and segregated files.
*396 Accordingly, the judgment appealed from should he reversed and the complaint dismissed, with costs in all courts.
Chief Judge Fudd and Judges Burke, Scileppi, Bergan, Jasen and Gibson concur.
Judgment reversed, etc.

 In passing it should he noted that defendants do not argue that otherwise protectible information might be exempted if it is shown that the employee’s appropriation was the result of experience or memory and not physical taking or copying. There are authorities which suggest that an employee may use in competition with his former employer the names, even lists, of customers retained in his memory (see Restatement, 2d, Agency, § 396, Comment b; Federal Laundry Co. v. Zimmerman, 218 Mich. 211, 214; Grand Union Tea Co. v. Dodds, 164 Mich. 50, 54-55; contra, People’s Apron & Towel Supply Co. v. Light, 171 App. Div. 671, affd. 224 N. Y. 727; United Ins. Co. v. Dienno, 248 F. Supp. 553; Van Prods. Co. v. General Weld. & Fabricating Co., 419 Pa. 248, 262-263; Colonial Laundries v. Henry, 48 R. I. 332, 336-338, see, generally, Ann., Customer List—As Trade Secret—Factors, 28 ALR 3d 7, at pp. 66-77).